USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

WALTER HUGHES,

                             Plaintiff,

               -v-

C.O. JULIO LEBRON,

                          Defendant.

------------------------------------------------------------------- X

14 Civ. 9479 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Walter Hughes brings this action under 42 U.S.C. § 1983 against defendant Julio

Lebron, a New York State Court Officer. Hughes brings two claims, for false arrest and

excessive force, both arising from his November 17, 2011 arrest at the Bronx County Criminal

Courthouse. Lebron now moves for summary judgment on the false arrest claim, arguing that

the arrest was supported by probable cause and that he is protected by qualified immunity. For

the reasons that follow, Lebron's motion is granted.

I.      **Background**

         A.      **Factual Background**[1]

---

[1] The Court's account of the underlying facts is drawn primarily from Lebron's submissions in
support of his summary judgment motion, including Lebron's Local Civil Rule 56.1 Statement of
Undisputed Material Facts, Dkt. 65 ("Def. 56.1"); the Declaration of Michael A. Berg, Dkts. 59,
66 ("Berg Decl."), and attached exhibits; the Declaration of Court Officer Julio Lebron, Dkt. 60
("Lebron Decl."); the Declaration of Court Officer Kevin Gunther, Dkt. 61 ("Gunther Decl.");
the Declaration of Court Officer Kevin Walters, Dkt. 62 ("Walters Decl."); and the Affidavit of
Sergeant Joseph Dalton, Dkt. 63 ("Dalton Aff.").

The video files attached as Exhibit A to the Berg Declaration (collectively, the "Video") are
certified copies of the footage captured on November 17, 2011, between 10:19:59 and 10:25
a.m., by three surveillance cameras at the Bronx County Criminal Courthouse. *See* Dalton Aff.

### 1.   The November 17, 2011 Arrest

On the morning of November 17, 2011, Hughes travelled to the Bronx County Criminal Courthouse, located at 215 East 161st Street in the Bronx (the "Courthouse"), to respond to a summons. *See* Def. 56.1 ¶ 1; Berg Decl., Ex. B ("Hughes Dep."), at 22. That morning, a set of metal barriers was set up in front of the Courthouse to guide visitors toward the building's front doors and to separate them from pedestrians on the sidewalk. Def. 56.1 ¶ 5; *see* Vid. 10:19:59–10:25. Court Officers Lebron and Kevin Gunther were assigned to a perimeter post that included patrolling the front of the Courthouse on 161st Street. Def. 56.1 ¶ 3.[2]

At about 10:20 a.m., Hughes, who is 6'2" and weighed approximately 280 lbs at the time, approached the Courthouse entrance. Def. 56.1 ¶¶ 6–7. He was carrying a large beverage mug and a newspaper. *Id.* ¶ 7; *see* Vid. 10:19:59–10:20:38. At that time, there was a steady stream of

---

¶ 2; Berg Decl., Ex. A ("Vid."). The Video is silent. The Court cites the Video according to the time stamp shown in its upper right-hand corner.

Citations to Lebron's 56.1 statement incorporate the evidentiary materials cited therein. Hughes did not submit a Rule 56.1 statement or any other evidence in support of his opposition to Lebron's motion. Where facts stated in Lebron's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by Hughes, or denied by Hughes without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

[2] Court officers are employees of the New York State Unified Court System. Lebron Decl. ¶ 1; Gunther Decl. ¶ 1. Their general duties "include protecting life and property in and around the Courthouse, responding to disturbances, arresting individuals suspected of criminal conduct, and handling prisoners." Lebron Decl. ¶ 3; Gunther Decl. ¶ 3. The specific duties of court officers stationed at the perimeter post include ensuring the smooth flow of pedestrian and vehicular traffic and responding to disturbances. Lebron Decl. ¶ 5; Gunther Decl. ¶ 5.

pedestrian traffic on the sidewalk surrounding the barriers.  *See* Vid. 10:19:59–10:20:38.  When

Hughes reached the first barrier, he pushed it outwards toward the middle of the sidewalk, nearly

striking a passerby pedestrian.  *See id.* at 10:20:39–43.[3]  Hughes then entered the Courthouse,

without looking back at the barrier, which, at that point, was jutting out on a diagonal into the

middle of the sidewalk.  *Id.*; Lebron Decl. ¶ 7.  He later testified that he "wanted [the barrier] out

of [his] way, because [he] saw no need for [it] to be there."  Hughes Dep. 48.

About 13 seconds later, Lebron, who had watched the foregoing unfold, replaced the

barrier in its original position.  *See* Vid. 10:20:49–52; Lebron Decl. ¶ 9.  In the intervening

moments, at least five pedestrians were required to navigate around the displaced barrier.  *See*

Vid. 10:20:39–52.

Lebron then "entered the Courthouse to continue observing [Hughes's] behavior and to

notify other court officers . . . to pay attention to [him] because he might be further disruptive."

Lebron Decl. ¶ 10.  Lebron attested that, "[b]ased on [Hughes's] appearance and conduct, [he]

thought [he] might be intoxicated, emotionally disturbed, or extremely agitated."  *Id.*  Officer

Gunther followed Lebron into the Courthouse to provide assistance.  *Id.* ¶ 9; Gunther Decl. ¶ 9.

---

[3] Hughes denies that the barrier almost hit a pedestrian. Dkt. 67 ("Rawlins Aff.") ¶¶ 3–4.  But
the Video "dooms [that] assertion.  Although on summary judgment the evidence must be
viewed in the light most favorable to Plaintiff[] as the non-moving part[y], when there is reliable
objective evidence—such as a recording—the evidence may speak for itself."  *Marcavage v. City
of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting plaintiffs' "characteriz[ation of] their
behavior toward the [arresting] officers as cordial" because "audio recording show[ed]
indisputably that they were neither courteous nor compliant") (citing *Scott v. Harris*, 550 U.S.
372, 378–81 (2007) (rejecting non-movant's account of police chase because it was "so utterly
discredited by the [video recording] that no reasonable jury could have believed him")); *see also
MacLeod v. Town of Brattleboro*, No. 10 Civ. 286, 2012 WL 5949787, at *7 (D. Vt. Nov. 28,
2012) ("In assessing whether there are triable issues of fact, the court may rely on facts as
depicted in an unaltered videotape and audio recording, even when such facts contradict those
claimed by the nonmoving party.") (citing *Scott*, 550 U.S. at 379–81), *aff'd*, 548 F. App'x 6 (2d
Cir. 2013) (summary order).  The Video here conclusively shows that the barrier came close to
hitting a passing pedestrian.

Upon entering the Courthouse, visitors must descend two flights of stairs to reach the lobby floor.  Lebron Decl. ¶ 11; Gunther Decl. ¶ 10; *see generally* Vid.  They are then guided by a set of ropes and barriers to form a line leading up to the magnetometers and x-ray machines.  *See id.*  By the time Lebron entered the Courthouse, Hughes had descended the stairs and was proceeding toward the line of people waiting to pass through the magnetometers.  Lebron Decl. ¶ 12; Gunther Decl. ¶ 11; Hughes Dep. 57; Vid. 10:20:51–59.  By virtue of his position in the line, Hughes was facing Lebron when Lebron came through the lobby doors.  Lebron Decl. ¶ 12; *see* Hughes Dep. 57; Vid. 10:20:59.

Because it lacks audio, the Video is less than fully revealing as to what happened next.  It shows that Hughes turned around and walked toward Lebron as he entered the lobby and descended the stairs.  Vid. 10:20:59–10:21:03.  The two men then engaged in what appears to be a verbal exchange (the "Pre-Arrest Exchange" or "Exchange") at the bottom of the stairs.  *See id.* at 10:21:03–16.[4]  The Exchange lasted approximately 13 seconds.  During that time, a police officer ushering a person in handcuffs down the stairs turned twice to look at Hughes and Lebron.  *Id.* at 10:21:05–12.  Toward the end of the Exchange, Lebron pointed toward the Courthouse entrance and both men looked in that direction.  *Id.* at 10:21:14.  By that time, two other court officers had joined Lebron at the bottom of the stairs, seemingly poised to provide assistance.  *Id.* at 10:21:11–14.  Throughout the Exchange, between six and 11 other individuals were present in the lobby.  *Id.* at 10:21:03–16.

After about 13 seconds, Lebron placed his hand on Hughes's upper arm.  *Id.* at 10:21:16. Hughes recoiled and turned his body away from Lebron and toward the barriers that separated

---

[4] Because Hughes's back is to the camera for the duration of the Exchange, it is impossible to discern the content or tone of his remarks.  But it is clear from Hughes' frequent hand gestures and movements that he was an active participant in the Exchange.

the main lobby from the security area.  *Id.* at 10:21:17–18.  Lebron and another officer pursued Hughes, and all three men fell into the barriers, which gave way, causing them to fall to the floor. *Id.* at 10:21:18–21.  Approximately a dozen court officers came to their assistance and eventually restrained Hughes, placing him in handcuffs.  *Id.* at 10:21:21–34.  Once restrained, Hughes continued to struggle and, it appears, to shout aggressively at the officers for nearly a minute, until he was escorted into a room behind the magnetometers.  *Id.* at 10:21:34–10:22:32.

The Court relies on the testimony of various witnesses supplied by Lebron to fill in many of the gaps in the Video—especially with regard to the substance of the Pre-Arrest Exchange. This evidence consists of declarations by Court Officers Lebron, Gunther, and Walters, and Hughes's deposition testimony.  The witnesses offer differing but overlapping accounts of the altercation.

At his deposition, Hughes testified as follows:  Upon entering the lobby, Lebron "bellowed" at him from the top of the steps:  "Do you have a problem?  What is your problem?" Hughes Dep. 59.  As Lebron came down the stairs, he "motioned that [Hughes] had d[one] something with the barrier that he didn't like."  *Id.*  Hughes responded, "Excuse me?" and walked towards Lebron, meeting him at the bottom of the stairs.  *Id.*

When asked about the ensuing Exchange, Hughes testified:

> I can't recall what I said to him.  I only know the questions that he was asking me, which was to go back up the stairs and place the barrier back into its original position.  And he pointed to go back up the stairs. . . .  I refused the aggressiveness that Lebron was insisting that I go back up the stairs and place the barrier back into its original position.

*Id.* at 60.  Hughes later testified that he told Lebron "[t]hat [he] had no intentions of going back up the stairs to place back the metal barrier."  *Id*. at 61–62; *see also id.* at 63 ("I told him no."). He explained, "[Lebron] had just c[o]me from that particular area.  I didn't see the sense of me

going back outside to put a barrier back in some sort of original position that he had the barrier."
*Id.* at 62.

At that point, Hughes testified, Lebron grabbed him by the arm and tried to pull him up the stairs. *Id.* at 63. According to Hughes, at no point before grabbing his arm did Lebron warn him that he would be arrested if he did not comply with his orders, or tell him to turn around so that he could be handcuffed. *Id.* at 63–64.

Lebron, for his part, offered the following account of the Exchange: When he asked Hughes what his problem was, Hughes responded by "yell[ing] and curs[ing] at [him] repeatedly, saying, 'I'm not fixing shit' and 'You don't know who the fuck I am.'" Lebron Decl. ¶ 15. Lebron then told Hughes to calm down and asked him what he was doing at the Courthouse. *Id.* ¶ 16. "As [Hughes] continued to yell and curse," Lebron "warned [Hughes] that if he didn't calm down, [he] would have to arrest him for disorderly conduct. [Hughes] remained loud and disruptive." *Id.*

Lebron attested:

As a result of [Hughes's] continuing confrontational conduct and his belligerent manner, I was concerned for my safety and that of the public and court personnel. [Hughes] is more than six feet tall and powerfully built. He was holding a large mug, and I was concerned that he might use it to strike me or another person. I perceived [Hughes] to be enraged and possibly intoxicated or emotionally disturbed.

At this time, I had not placed any hands upon [Hughes]. However, as he continued to fail to cooperate with me and disrupt the entry to the Courthouse, I decided to take [Hughes] into custody and issue him a summons for disorderly conduct.

*Id.* ¶¶ 17–18.

6

At that point, Lebron attested, he ordered Hughes to put his hands behind his back so that he could handcuff him.  *Id.*  ¶ 19.  He then reached out and took hold of Hughes's left arm.  *Id.* The struggle depicted in the Video ensued.  *See id.* ¶¶ 19, 21–23.

Lebron's account of the Pre-Arrest Exchange is supported by the declarations of Court Officers Walters (who observed the Exchange from his post at the magnetometers and later assisted Lebron in restraining Hughes) and Gunther (who was stationed with Lebron at the perimeter post, followed him into the lobby, and assisted him in restraining Hughes).  *See* Walters Decl. ¶¶ 5, 12; Gunther Decl. ¶¶ 5, 9, 16–17.  Walters attested that:

> While working at the magnetometers at about 10:20 a.m. on November 17, 2011, my attention was drawn to the sound of shouting and obscenities.  I looked toward the Courthouse lobby and saw [Hughes] standing at the bottom of the steps, facing Officer Lebron.  I heard [Hughes] yelling curses, including the words "shit" and "fucking," at Officer Lebron.  To the best of my recollection, [Hughes] yelled the phrases "I'm not doing shit" and "I'm not going any fucking where" at Officer Lebron.  At this time, I did not view Officer Lebron placing any hands upon [Hughes].  However, after [Hughes] continued to yell and curse, Officer Lebron took hold of [his] left arm to take him into custody.

Walters Decl. ¶¶ 8–10.

Gunther similarly attested that, before Lebron "plac[ed] any hands upon [Hughes]," he heard Hughes yell "loudly and in a harsh tone": "I'm not fixing shit," "I'm not moving the gate back," and "I'm not moving the fucking gate."  Gunther Decl. ¶¶ 12, 14.  He attested that Lebron told Hughes to calm down, but that Hughes "continued to yell . . . about the railing or 'gate.'" *Id.* ¶ 13.  At that point, he attested, Lebron "attempted to arrest [Hughes], taking hold of his upper left arm."  *Id.* ¶ 14.

### 2.    Aftermath

On November 18, 2011, Hughes was charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and disorderly conduct, in violation of N.Y. Penal Law § 240.20(7), based

on the incident at the Courthouse.  Def. 56.1 ¶ 20; Berg Decl., Ex. C.  The prosecutor later

dismissed the resisting arrest charge and added a charge of disorderly conduct, in violation of

N.Y. Penal Law § 240.20(3).  *Id.*  On August 23, 2013, Hughes agreed to an adjournment in

contemplation of dismissal of the disorderly conduct charges.  *Id.* ¶ 21.

> **B.    Procedural History**

On September 12, 2014, Hughes filed the original complaint in this case in the New York

State Supreme Court, Bronx County.  Dkt. 1, ¶ 1.  On December 2, 2014, Lebron removed the

case to this Court.  *Id.*

On February 9, 2015, Lebron moved to dismiss the complaint, under Federal Rule of

Civil Procedure 12(b), for failure to state a claim.  Dkt. 8.  On March 2, 2015, Hughes filed an

amended complaint.  Dkt. 22.  It brought claims, pursuant to 42 U.S.C. § 1983, for false arrest

and excessive force.  *Id.*  On March 23, 2015, Lebron answered.  Dkt. 24.

On January 8, 2016, the Court held a pre-motion conference.  *See* Transcript of January

8, 2016 Pre-Motion Conference ("Tr.").  On February 19, 2016, Lebron filed a motion for partial

summary judgment on Hughes's false arrest claim, Dkt. 58, along with a Rule 56.1 statement,

Def. 56.1, and a memorandum of law in support, Dkt. 64 ("Def. Br.").  Lebron also submitted

four supporting declarations, Berg Decl.; Lebron Decl.; Gunther Decl.; Walters Decl., a

supporting affidavit, Dalton Aff., and attached exhibits.

On March 5, 2016, Hughes submitted an affirmation by his counsel in opposition to

Lebron's motion.  Rawlins Aff.  Hughes did not file a Rule 56.1 statement or opposition brief.[5]

On March 11, 2016, Lebron replied.  Dkt. 68.

---

[5] However, the last three paragraphs of Hughes's counsel's affirmation are designated
"ARGUMENT," and set forth legal arguments opposing summary judgment.  *See* Rawlins Aff.
¶¶ 7–9.  Lebron argues that these arguments must be disregarded because, "under Local Civil

## II.     Applicable Legal Standards for Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

---

Rule 7.1, legal argument must be set forth in a memorandum of law, not in an attorney affirmation." Def. Br. 5–6 (quoting *Dejana Indus., Inc. v. Vill. of Manorhaven*, No. 12 Civ. 5140 (JS), 2015 WL 1275474, at *3 (E.D.N.Y. Mar. 18, 2015)) (internal quotation marks omitted). The Court would indeed be well within its authority to strike paragraphs 7–9 of the Rawlins Affirmation on that basis. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 419–20 (S.D.N.Y. 2014) (rejecting attorney affirmation because it improperly contained legal argument and facts not based on counsel's personal knowledge); *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 465 n.3 (E.D.N.Y. 2012) ("Placing legal argument in an affidavit is plainly improper, and the Court will only consider the facts in the affidavit that are based on . . . personal knowledge and admissible in evidence."). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). And the Court strongly prefers to resolve parties' claims on the merits, rather than to dispose of them based on procedural default. For this reason, in considering Lebron's motion, the Court treats the "ARGUMENT" portion of the Rawlins Affirmation as Hughes's opposition brief and addresses the arguments set forth therein.

"citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also*

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

248 (1986).  In determining whether there are genuine issues of material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d

Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation

marks omitted).

**III.    Discussion**

      **A.    Applicable Law Governing § 1983 False Arrest Claims**

Section 1983 provides redress for a deprivation of federally protected rights by persons

acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must

establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws

of the United States (2) by a person acting under the color of state law.  *West v. Atkins*, 487 U.S.

42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual

to be free from unreasonable seizures, including arrest without probable cause, is substantially

the same as a claim for false arrest under New York law."  *Weyant v. Okst*, 101 F.3d 845, 852

(2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v.

City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).  Under New York law, a plaintiff bringing a

claim for false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the

plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement

and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)) (internal quotation marks omitted).

A confinement is privileged where the arresting officer had probable cause to arrest. *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)). Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Lacey v. Daly*, 26 F. App'x 66, 67 (2d Cir. 2001) (summary order) (quoting *Singer*, 63 F.3d at 119) (internal quotation marks omitted).

The lawfulness of an arrest does not depend on an ultimate finding of guilt or innocence. *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Wiltshire v. Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015) (that charges were later dropped is "irrelevant" to question of whether probable cause existed at time of arrest). Rather, "[w]hen determining whether probable cause exist[ed] courts must consider those facts *available to the officer* at the time of the arrest." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in *Panetta*); *accord Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal

quotation marks and citation omitted).  Accordingly, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  "[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested [] committed *any crime*." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (emphasis added).

"The burden of establishing the absence of probable cause rests on the plaintiff." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015) (internal quotation marks omitted). The Court may determine, as a matter of law, whether probable cause existed where there is no dispute as to the pertinent events or the knowledge of the arresting officers. *Weyant*, 101 F.3d at 852.

Even if there was not probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed—*i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks and citation omitted). The doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *accord Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999).  Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct.

1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation marks omitted).

### B.     Analysis

In moving for partial summary judgment on Hughes's false arrest claim, Lebron does not contest that Hughes has established the first three elements of that claim: that (1) Lebron intentionally confined Hughes, and that Hughes was (2) conscious of, and (3) did not consent to, the confinement.  Lebron concedes that he initiated the arrest the moment he placed his hand on Hughes's arm.  *See* Tr. 7–8.  He argues, however, that Hughes cannot satisfy the fourth element of his claim—that the confinement was not otherwise privileged—because there was probable cause to arrest Hughes for disorderly conduct.  Def. Br. 13–18.  Alternatively, Lebron argues, he is shielded by qualified immunity, because there was arguable probable cause for Hughes's arrest.  *Id*. at 18–19.  The Court addresses each argument in turn.

### 1.     There was Probable Cause to Arrest Hughes for Disorderly Conduct

Under New York law, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," he: (1) "engages in fighting or in violent, tumultuous or threatening behavior"; (2) "makes unreasonable noise"; (3) "[i]n a public place, [] uses abusive or obscene language, or makes an obscene gesture"; (4) "[w]ithout lawful authority, [] disturbs any unlawful assembly or meeting of persons"; (5) "obstructs vehicular or pedestrian traffic"; (6) "congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse"; or (7) "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose." N.Y. Penal Law § 240.20.

The offense has three elements:  The defendant's conduct must (1) "match at least one of the descriptions set forth in the statute"; (2) be "public" in nature; and (3) "be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to a 'risk thereof.'" *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001) (quoting N.Y. Penal Law § 240.20).

As to the second element, "[t]he New York disorderly conduct statute punishes 'disruptive behavior . . . of [a] public rather than individual dimension.'" *Id.* (quoting *People v. Munafo*, 50 N.Y.2d 326, 331 (1980)).  It is directed at "situations that carr[y] beyond the concern of individual disputants to a point where they . . . become a potential or immediate public problem." *Id.* (quoting *Munafo*, 428 N.Y.2d at 331) (internal quotation marks omitted).  The New York Court of Appeals has instructed that, in considering whether this element is satisfied, the Court should "employ[] a contextual analysis that turns on consideration of many factors, including 'the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances.'" *People v. Baker*, 960 N.Y.3d 354, 360 (2013) (quoting *People v. Weaver*, 16 N.Y.3d 123, 128 (2011)).  It has emphasized, however, that "a defendant may be guilty of disorderly conduct regardless of whether the action results in public inconvenience, annoyance or alarm," as long as the conduct "recklessly creates a risk of such public disruption."  *Weaver*, 16 N.Y.3d at 128.[6]

------

[6] *See also Weaver*, 16 N.Y.3d at 128 ("[T]here is no per se requirement that members of the public . . . be involved or react to the incident."); *Baker*, 20 N.Y.3d at 360 ("We have clarified that the risk of public disorder does not have to be realized but the circumstances must be such that defendant's intent to create such a threat (or reckless disregard thereof) can be readily inferred."); *People v. Todaro*, 26 N.Y.2d 325, 329 (1970) ("[A]ppellant's emphasis on the contention that the *fact* of disorder was not established, to the exclusion of the *risk* that it might

As to the *mens rea* requirement, intent may be inferred based on circumstantial evidence, including the defendant's conduct and the surrounding circumstances. *See People v. Bracey*, 41 N.Y.2d 296, 301 (1977); *People v. Rubackin*, 26 N.Y.S.3d 215, 2015 WL 5775824, at *2 (2d Dep't 2015) (table decision). "[U]nlike at trial, where circumstantial evidence must support a finding of culpable intent beyond a reasonable doubt, a probable cause determination . . . can be made on substantially less evidence." *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013) (internal quotation marks and citation omitted). As the Second Circuit has explained, "because the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." *Id.* (internal quotation marks and citation omitted).

Applying these principles, the Court holds that, by the time Lebron took hold of Hughes's arm, there was probable cause to arrest him for disorderly conduct.

As an initial matter, it is undisputed that, in the moments leading up to the arrest, Hughes unleashed an expletive-laden tirade against Lebron in the Courthouse lobby. Lebron, Gunther, and Walters each attested that, before Lebron placed a hand on Hughes, Hughes yelled multiple obscenities at him, including "I'm not fixing shit," "I'm not going any fucking where," and "You don't know who the fuck I am." Lebron Decl. ¶¶ 15–16, 18; Gunther Decl. ¶¶ 12–14; Walters Decl. ¶¶ 9–10. This conduct falls squarely within the scope of both N.Y. Penal Law § 240.20(2), which prohibits "mak[ing] unreasonable noise," and § 240.20(3), which prohibits "us[ing] abusive or obscene language" in a "public place."

---

come to pass, ignores the very terms of the statute itself."); *People v. Kennedy*, 19 N.Y.2d 761, 762 (1967) ("It is enough that disorder was threatened by defendant's conduct.").

Although Hughes, through his counsel's unsworn affirmation, conclusorily denies that he yelled profanities, Rawlins Aff. ¶¶ 3, 5, he has offered no viable evidence that refutes the Court Officers' attestations.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (party opposing summary judgment "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") (collecting cases); *Cancel v. NYPD Comm'r Raymond Kelly*, No. 13 Civ. 6007 (JMF), 2016 WL 590230, at *4 (S.D.N.Y. Feb. 11, 2016) ("Bare, *ipse dixit* denials . . . carry little or no weight at the summary judgment stage.").  Under 28 U.S.C § 1746, an unsworn declaration or affirmation constitutes admissible evidence "only when it is expressly subscribed as true *under penalty of perjury*."  *Rossi v. Fischer*, No. 13 Civ. 3167 (PKC) (DF), 2014 WL 5786942, at *3 n.3 (S.D.N.Y. Mar. 31, 2014) (rejecting declaration for failure to comply with § 1746), *report and recommendation adopted*, 2014 WL 5786908 (S.D.N.Y. Apr. 15, 2014).  Because Hughes's counsel's affirmation was not,[7] it is of "no evidentiary value on summary judgment.  Indeed, it may not be considered on summary judgment."  *Aersale Inc. v. Ibrahim*, No. 13 Civ. 713 (KBF), 2013 WL 5366384, at *4 (S.D.N.Y. Sept. 25, 2013) (rejecting attorney's unsworn affirmation and party's unsworn declaration for failure to comply with § 1746).[8]

Nor does Hughes's deposition testimony create an issue of fact on this point.  *See* Rawlins Aff. ¶¶ 7–8.  Critically, Hughes did not there deny that he shouted expletives at Lebron.

---

[7] Hughes's counsel does not even state that the matters his affirmation recites are true and correct.  *See* Rawlins Aff.; *see also Sterling Fifth Assocs. v. Carpentile Corp.*, No. 03 Civ. 6569 (HB), 2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) (rejecting unsworn declaration under § 1746 because declarant did not swear its contents were true and correct).  By contrast, Lebron, Gunther, and Walters each "declare[d] under penalty of perjury that [everything set forth in his declaration] is true and correct."  Lebron Decl. 7; Gunther Decl. 4; Walters Decl. 4.

[8] Counsel's recitation of Hughes's denial is separately inadmissible on the ground that it is hearsay.  *See Aersale*, 2013 WL 5366384, at *4.

Rather, he testified only that (1) he could not recall what he said to Lebron during the Exchange; and (2) he told Lebron that he "had no intentions of going back up the stairs to place back the metal barrier." Hughes Dep. 60–62. But it is well established that "a party's failure to remember what he said is not sufficient to create a genuine issue of material fact." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 414 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) (summary order).[9] And Hughes's testimony that he told Lebron that he had "no intentions" of fixing the barrier is not inconsistent with his also having made that point in "obscene" or "unreasonably nois[y]" terms. N.Y. Penal Law §§ 240.20(2), (3).[10] On the summary judgment record, therefore, a reasonable jury could only find that, in the moments leading up to the arrest, Lebron observed Hughes engaging in conduct proscribed by § 240.20— thus satisfying the first element of a disorderly conduct charge.

As to the second element, the "public disruption" requirement, the undisputed facts compel the conclusion that Lebron's conduct was "public" in nature. As noted, in determining whether this element is satisfied, the Court must consider "the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the

---

[9] *See, e.g.*, *Kennedy v. City of New York*, 570 F. App'x 83, 84–85 (2d Cir. 2014) (summary order) (plaintiff's testimony that he was "unable to remember whether he encountered any red lights before being pulled over" was "not sufficient to contradict [officer's] testimony [that he saw plaintiff run a red light], or to raise a genuine dispute of fact"; affirming summary judgment for defendant on false arrest and malicious prosecution claims); *see also id.* at 85 (where plaintiff testified at deposition that he could not remember a particular fact, he could not, in response to summary judgment motion, submit affidavit claiming recollection that would have raised an issue for trial).

[10] *See Posr v. New York State Court Officer*, No. 96 Civ. 5200 (CLP), 2006 WL 656985, at *8 (E.D.N.Y. Mar. 13, 2006) (plaintiff's testimony that "his 'sense' was that 'everything was flowing,'" and that "he 'couldn't say' whether traffic had stopped or not because he was 'totally focused' on the court officer" did not contradict officers' testimony that plaintiff was obstructing pedestrian traffic).

vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances.'" *Baker*, 960 N.Y.3d at 360 (quoting *Weaver*, 16 N.Y.3d at 128). Here, it is undisputed that the Exchange occurred during business hours in the lobby of a criminal courthouse—a setting in which even a minor disturbance may rise to the level of a "public problem." *Provost*, 262 F.3d at 157 (quoting *Munafo*, 428 N.Y.2d at 331). As the Seventh Circuit has explained:

> Because of the character of a courthouse's clientele and the importance of preserving a calm atmosphere for the sake particularly of the lay people— witnesses and jurors, outsiders to the legal system—who nevertheless play a vital role in the administration of justice, police and guards are entitled to exercise a degree of control that would be oppressive in a different setting.

*Braun v. Baldwin*, 346 F.3d 761, 765 (7th Cir. 2003); *id.* at 762–65 (probable cause existed to arrest under analogous disorderly conduct ordinance where defendant refused to comply with officer's instruction to "step aside" in courthouse lobby, and "instead threatened to sue [the officer]"). It is also undisputed that between six and 11 individuals were present in the lobby throughout the Exchange, and that at least three were "drawn to the disturbance."[11] *Compare Provost*, 262 F.3d at 157–58 ("conduct was sufficiently public to trigger the disorderly conduct statute" where "incident occurred in the police station [when] six or seven members of the public were in the waiting room, and [] a number of police officers were present in the station"), *with Munafo*, 50 N.Y.2d at 331–32 (evidence insufficient to sustain disorderly conduct conviction where defendant's confrontation with State Power Authority construction crew took place in

---

[11] That is, at least three individuals appear to have been drawn to the *Pre-Arrest* Exchange. A substantially greater disruption occurred moments later, once Lebron attempted to initiate the arrest: The tumultuous struggle that ensued attracted the attention of at least 15 civilians and 11 court officers who left their posts to help subdue Hughes. *See* Vid. 10:21:18–10:22:21.

broad daylight on his own property, "far removed from any public thoroughfare or business or residential area," and "not a single bypasser was attracted to the scene").

As to the nature and character of the conduct, Lebron attested that, in addition to using obscene language, Hughes was "confrontational" and "belligerent," and appeared to be "enraged and possibly intoxicated or emotionally disturbed."  Lebron Decl. ¶ 17.  Accordingly, Lebron attested, he was "concerned that [Hughes] might use [his mug] to strike [him] or another person."  *Id.*  Given Hughes's forceful displacement of the barrier just moments earlier, Lebron's apprehension was objectively reasonable.  Indeed, his concerns were borne out by Hughes's exaggerated response to Lebron's attempt to grasp his arm.  *See* Lebron Decl. ¶¶ 19–22 ("[Hughes] twisted away from me, flailed one or both arms, and took several steps toward a set of metal barriers . . . that separated the central lobby from the security area.  In twisting away from me, [Hughes] almost collided with a woman who was walking down the steps. . . . [Hughes] continued to resist by twisting his body and arms even after falling to the floor. . . . Eventually, we were able to restrain [Hughes] . . . and I cuffed his hands behind his back.  Even then, he continued to struggle and to yell at my fellow officers and myself.").  Faced with these facts, a reasonable juror could only conclude that the "vocal and aggressive confrontation" "extend[ed] beyond the exchange between the individual disputants to a point where it bec[ame] 'a potential or immediate public problem.'"  *Weaver*, 16 N.Y.3d at 128–29 (quoting *Munafo*, 50 N.Y.2d at 331).[12]

---

[12] *Compare Baker*, 20 N.Y.3d at 362–63 (insufficient proof of public harm where defendant made two abusive statements to officer on public street, where statements "were not accompanied by menacing conduct," "officer was in a position of safety [in his patrol car] and could have closed his windows and ignored defendant," and there was "no basis to infer that [officer] felt threatened by the statements"), *and People v. Fassinger*, 975 N.Y.S.2d 602, 605 (Auburn City Ct. 2013) (insufficient proof of public harm where officer was "in the safety of his patrol car," "[t]he gestures and statements made by Defendant, although crude and disrespectful,

Finally, as to the *mens rea* requirement, Hughes's conduct and the circumstances surrounding the Exchange unavoidably support an inference that Hughes at least recklessly created a risk of "public inconvenience, annoyance or alarm."  N.Y. Penal Law § 240.20.  As one New York court has observed, "disruptive conduct involving loud profane language and tumultuous physical behavior in a public building, where members of the public are actually or reasonably anticipated to be present, is deemed almost inherently to pose a risk of public inconvenience, annoyance, or alarm, given the confined spaces, the number of persons typically present, and the likelihood that disorderly conduct would be observed by others."  *People v. O'Neill*, 26 N.Y.S.3d 215, 2015 WL 5775832, at *2–3 (2d Dep't 2015) (table decision) (affirming disorderly conduct conviction where defendant, at 3:10 p.m. at Yonkers City Hall, directed "loud profane insults," accompanied by threatening gestures, at City Hall employee, when several members of the public were "seated only a few feet away" in the waiting room).[13] Here, multiple members of the public were in fact present during the disruption.

---

were not likely to incite further events," and there was "[no] indication that Defendant moved toward the officer in a threatening manner . . . [or that] any member of the public even knew what was occurring"), *with Cancel*, 2016 WL 590230, at *1, *4 ("no dispute that Plaintiff's conduct was 'public' in nature" where confrontation took place in crowded bar, plaintiff disobeyed officers' instruction to "step away from the bar (where there were bottles and glasses that could conceivably be used as weapons)," and tried to argue with officers when they approached him individually), *and People v. Brown*, 497 N.Y.S.2d 934, 936 (2d Dep't 1986) ("Once defendant became publicly abusive and used obscenities against [Trooper] Martin, which conduct was apparently noticed by other persons who had entered the service area, Martin reasonably could have believed that defendant's behavior under the circumstances constituted a public disturbance and the subsequent arrest for disorderly conduct was therefore proper." (internal citations omitted)).

[13] *See also United States v. Nelson*, 500 F. App'x 90, 94 (2d Cir. 2012) ("Nelson's combative tone and abusive language, coupled with the location of the incident [outside a public market], were sufficient to warrant a person of reasonable caution in the belief that Nelson was recklessly creating the relevant risks." (internal quotation marks omitted)); *Tobias v. Cty. of Putnam*, 191 F. Supp. 2d 364, 374–75 (S.D.N.Y. 2002) (officers reasonably believed plaintiff had requisite intent for disorderly conduct charge, where he "spoke to the officer defendants in front of the cottage,

Therefore, based on the undisputed facts known to Lebron at the time, there was probable cause to believe that Hughes's conduct in the Courthouse lobby "satisfied all three components" of §§ 240.20(2) and (3), *Cancel*, 2016 WL 590230, at *4 (quoting *Provost*, 262 F.3d at 157), "making out a 'complete defense to [Hughes's] action for false arrest.'" *Id.* (quoting *Jenkins*, 478 F.3d at 84).[14]

In light of this ruling, the Court need not determine whether, as Lebron claims, Hughes's act of displacing the barrier outside the Courthouse independently supplied probable cause for his arrest. As noted, before entering the Courthouse, Hughes pushed aside a metal barrier

---

peppered his argument with profanities, made a significant spectacle, and attracted the attention of at least one neighbor"); *People v. Gluckjhagroo*, 20 N.Y.S.3d 293, 2015 WL 5682868, at *1 (1st Dep't 2015) (table decision) ("factfinder[] was warranted in concluding that defendant's conduct—using abusive and obscene language at the arresting officer in the Penn Station LIRR waiting area—recklessly created a risk of a 'potential or immediate public problem'" (quoting *Weaver*, 16 N.Y.3d at 128), *leave to appeal denied*, 26 N.Y.3d 1088 (2015); *Lazarus v. State*, 980 N.Y.S.2d 276, 2013 WL 4757033, at *3 (Ct. Cl. 2013) (table decision) (where claimant was "loud, used abusive or obscene language that attracted the attention of the already crowded [courthouse] corridor, [and] had been told on several occasions to cease," he "was acting at least recklessly, if not with intent" to a cause public disturbance).

[14] *See, e.g.*, *Weaver*, 16 N.Y.3d at 128–29 (affirming disorderly conduct conviction where defendant was loudly yelling and waiving his arms in parking lot outside hotel at 1:25 a.m., and became "vocal and aggressive" when confronted by officer, repeatedly shouting obscenities at his wife and officer, despite three warnings to settle down); *Rubackin*, 2015 WL 5775824, at *1– 2 (affirming disorderly conduct conviction where officer responding to 911 call found defendant "acting irate, yelling and flailing his arms" in a CVS, and defendant, when approached by officer, "became aggressive . . . and raised his hands as if to fight" him) (internal quotation marks omitted); *People v. Terry*, 950 N.Y.S.2d 493, 2012 WL 231553, at *1 (1st Dep't 2012) (table decision) (affirming disorderly conduct conviction where defendant yelled and loudly cursed at arresting officer in crowded subway station); *People v. Morena*, 824 N.Y.S.2d 769, 2006 WL 2161002, at *1–2 (Crim. Ct. N.Y. Cty. 2006) (table decision) (allegation that defendant, while standing on street corner at 11:21 p.m., screamed, "Go fuck yourself. Fuck you cop" at officer, causing "annoyance and alarm to the general public," established "reasonable cause to believe" that defendant had violated § 240.20(3)); *People v. Santora*, 209 N.Y.S.2d 499, 500 (Cty. Ct. Westchester Cty. 1961) (affirming disorderly conduct conviction where defendant used "vile, profane and abusive" language toward police officer, resulting in neighbors leaving their front porches and approaching the officer).

installed on the sidewalk, nearly striking a passerby.  *See* Vid. 10:20:39–43.  In the few seconds before Lebron replaced the barrier to its original position, approximately five pedestrians were required to navigate around it.  *Id.* at 10:20:39–52.  Hughes later testified that he "wanted [the barrier] out of [his] way because [he] saw no need for [it] to be there."  Hughes Dep. 48.

On its face, this conduct appears to fall within the scope of N.Y. Penal Law § 240.20(5), which prohibits obstructing pedestrian traffic "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof."  However, "New York courts have interpreted this provision to permit punishment only where the conduct at issue does more than merely inconvenience . . . traffic," *Jones v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006), such as where protesters block traffic for a significant period of time or cause an "unusual traffic disruption," *Evans v. City of New York*, No. 12 Civ. 5341 (MKB), 2015 WL 1345374, at *32 (E.D.N.Y. Mar. 25, 2015) (collecting cases).[15]  Because Hughes's displacement of the barrier created only a temporary inconvenience to a limited number of pedestrians, it did not clearly rise to that level.

The Court is similarly unpersuaded that the barrier displacement was sufficiently obstructive to trigger § 240.20(7), which prohibits creating, with the requisite intent, a "hazardous or physically offensive condition by any act which serves no legitimate purpose."

---

[15] *See, e.g.*, *Evans*, 2015 WL 1345374, at *11 ("The undisputed facts that Plaintiff was convicted for obstructing an intersection and disobeying a police officer fail to show more than an inconvenience to vehicular traffic, and therefore do not establish probable cause [to arrest for a violation of § 240.20(5)] as a matter of law."); *People v. Johnson*, 22 N.Y.3d 1162, 1163–64 (2014) (dismissing indictment against defendant charged with disorderly conduct for refusing to obey officer's order to move from street corner where he was partially blocking a store entrance, because there was no evidence of "actual or threatened public harm"); *People v. Pearl*, 321 N.Y.S.2d 986, 987 (1st Dep't 1971) ("Something more than the temporary inconvenience caused to pedestrians by the demonstrators' blocking of the west crosswalk, requiring them to enter the roadway to get to the other side, was required to sustain a conviction for obstructing pedestrian traffic.").

22

*See, e.g.*, *People v. Wharton*, 819 N.Y.S.2d 850, 2006 WL 1094556, at *4 (Cty. Ct. Nassau Cty. 2006) (table decision) ("This section of the statute . . . pertain[s] to . . . situations such as throwing fireworks into a crowd or loosening noxious chemicals within a confined area such as a theater; or strewing garbage, nails or noxious substances in public passages." (internal citations omitted)).  It was this provision of the disorderly conduct statute, along with resisting arrest, which Hughes was initially charged with violating.  Def. 56.1 ¶ 20.  (Hughes was later charged with violating § 240.20(3)).  *Id.*  Critically, however, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly*, 439 F.3d at 154.  Rather, an arrest is lawful "so long as the officer ha[d] . . . probable cause to believe that the person arrested ha[d] committed *any crime*."  *Zellner*, 494 F.3d at 369 (emphasis added).[16]  Therefore, because the Court has held that Lebron had probable cause to arrest Hughes for disorderly conduct under §§ 240.20(2) and/or (3), Hughes's false arrest claim fails as a matter of law.  Lebron is thus entitled to summary judgment on that claim.

### 2.      Lebron is Shielded by Qualified Immunity

Even if there were not probable cause to arrest Hughes for disorderly conduct, his false arrest claim would still fail, because it is clear that there was at least arguable probable cause for

---

[16] It follows that any dispute as to Lebron's subjective basis for the arrest is immaterial and does not, as Hughes claims, preclude summary judgment. *See* Rawlins Aff. ¶ 9 ("There is an issue of fact as to whether Mr. Hughes was arrested for refusing to replace the barrier that had already been replaced or for refusing to comply with orders defendant claims to have issued requiring Plaintiff to present himself for arrest."); *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  Any dispute whether Lebron "attempted to force [Hughes] up the stairs to move the barrier," Rawlins Aff. ¶ 9, is similarly immaterial, as it has no bearing on probable cause:  Because the probable cause inquiry focuses on the officer's knowledge at the moment he initiated the arrest, *see Panetta*, 460 F.3d at 395, it is irrelevant whether Lebron, after restraining Hughes, tried to force him up the lobby steps.

his arrest.  *See Washpon v. Parr*, 561 F. Supp. 2d 394, 403–04 (S.D.N.Y. 2008).  That is, based

on the undisputed facts known to Lebron at the time, "officers of reasonable competence could

disagree on whether the probable cause test was met."  *Golino*, 950 F.2d at 870; *see, e.g.*, *Adonis

v. Coleman*, No. 08 Civ. 1726 (MGC), 2009 WL 3030197, at *8 (S.D.N.Y. Sept. 23, 2009)

(officer "had at least arguable probable cause to arrest [plaintiff] for disorderly conduct . . . on

the basis of unreasonable noise under New York Penal Law § 240.20(2)" where plaintiff "raised

her voice and refused to leave" courthouse); *Washpon*, 561 F. Supp. 2d at 403 ("[E]ven if the

officers had mistakenly believed that Washpon used profanity or that there were other people in

the courthouse lobby, (and as a matter of common sense people come in and out of courthouse

lobbies all the time) then qualified immunity would protect the officers as long as their belief

was reasonable.").  Accordingly, Lebron is entitled to qualified immunity on Hughes's false

arrest claim.  This ruling supplies an independent basis for granting Lebron's motion for

summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, the Court grants Lebron's motion for partial summary

judgment as to Hughes's false arrest claim.  Hughes may proceed to trial against Lebron on his

excessive force claim.  The Court directs counsel to meet and confer in person within three

weeks of this decision to attempt to resolve this case.  In the event a settlement is not reached, a

joint pretrial order, motions *in limine*, proposed *voir dire* questions, and requests to charge will

be due on October 31, 2016.  Oppositions to any motions *in limine* will be due November 7,

2016.  After the Court reviews the parties' submissions, the Court's staff will contact counsel to

schedule a trial date.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 58.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 19, 2016
New York, New York